UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. |
| | : | |
| | : | VIOLATIONS: 18 U.S.C. §§ 371, 1341, 2, 981, 28 U.S.C. § 2461 |
| v. | : | (Conspiracy to Defraud the United States, Mail Fraud, Causing an Act to Be Done, Forfeiture) |
| DANIEL CURRAN, | : | |
| | : | UNDER SEAL |
| Defendant. | : | |

## STATEMENT OF THE OFFENSE

1.  From in or about October 2000 until June 2005, DANIEL CURRAN ("CURRAN") was the owner and president of Dankim Trading Company ("Dankim Trading"), an exporting company that was in the business of purchasing United States goods on behalf of clients in the Philippines and shipping those goods overseas. From in or about October 2000 until June 2005, CURRAN, through Dankim Trading, acted as a purported "exporter" in approximately $30 million worth of fraudulent loan transactions, falsified documents sent to United States banks and to the Export-Import Bank of the United States (the "Ex-Im Bank"), and misappropriated more than $24 million in loan proceeds that were guaranteed by the Ex-Im Bank.

2.  In or about October 2000, CURRAN met with a co-conspirator ("CC-2") and agreed that CURRAN, through Dankim Trading, would act as "exporter" in loan transactions brokered by CC-2 between Philippine borrowers and United States lending banks, in which the Ex-Im Bank was guaranteeing the loans. CC-2 agreed to pay CURRAN a fee of between 1.5-2.5% of the value of the purported goods to be shipped.

3. In or about October 2000, CC-2 instructed CURRAN that lending banks would not pay loan proceeds to Dankim Trading until the banks and the Ex-Im Bank received a Commercial Invoice, Packing List, Bill of Lading, and Ex-Im Bank Supplier's Certificate documenting the amount, value, and origin of United States goods shipped to the Philippines.

4. From in or about November 2000 until May 2005, CURRAN prepared false Commercial Invoices and Packing Lists documenting approximately $30 million worth of United States goods that he had purportedly purchased and shipped to the Philippine borrowers. For each transaction, both CURRAN and CC-2 knew at the time these documents were prepared that the representations made by CURRAN on the Commercial Invoices and Packing Lists falsely represented the amount, value, and origin of the United States goods shipped to the Philippines.

5. From in or about November 2000 until May 2005, CURRAN caused the preparation of false Bills of Lading by sending the false Commercial Invoices to a freight forwarder for the purpose of creating Bills of Lading that appeared to match the description of goods contained on the false Commercial Invoices. For each transaction, both CURRAN and CC-2 knew at the time these documents were prepared that the Bills of Lading falsely represented the type and amount of United States goods shipped to the Philippines.

6. From in or about November 2000 until May 2005, CURRAN prepared false Ex-Im Bank Supplier's Certificates certifying that he had purchased and shipped approximately $30 million worth of United States goods to the Philippine borrowers. For each transaction, both CURRAN and CC-2 knew at the time these documents were prepared that the representations made by CURRAN on the Ex-Im Bank Supplier's Certificates falsely represented the amount, value, and origin of the goods shipped to the Philippines.

7.  From in or about November 2000 until May 2005, CURRAN sent to Ex-Im Bank, through the lending banks, the Commercial Invoices, Packing Lists, and Ex-Im Bank Supplier's Certificates that he prepared and the Bills of Lading that he caused to be prepared, as proof that he had purchased and shipped approximately $30 million worth of United States goods to the Philippine borrowers. For each transaction, both CURRAN and CC-2 knew at the time that the Commercial Invoices, Packing Lists, Bills of Lading, and Ex-Im Bank Supplier's Certificates falsely represented the amount, value, and origin of the goods shipped to the Philippines.

8.  From in or about December 2000 until June 2005, Dankim Trading received approximately $24 million in loan proceeds from the lending banks based on CURRAN's false representations to the lending banks and the Ex-Im Bank that Dankim Trading had spent approximately $30 million to purchase United States goods and had shipped those goods to the Philippines. CURRAN and CC-2 knew at the time that CURRAN and Dankim Trading had actually spent an amount materially and substantially less than $30 million on the goods purchased and shipped to the Philippines. After receiving the approximately $24 million in fraudulent loan proceeds, CURRAN kept approximately $400,000 of the loan proceeds and transferred approximately $23 million of the loan proceeds to bank accounts owned and controlled by CC-2 and others.

9.  On or about September 16, 2002, CURRAN knowingly caused to be delivered through Federal Express, a commercial interstate carrier, an Ex-Im Bank Supplier's Certificate to UPS Capital Business Credit, knowing at the time that it would be forwarded to the Ex-Im Bank. CURRAN knew at the time that the pretenses, representations, and promises contained in the Ex-

Im Bank Supplier's Certificate as to the amount, value, and origin of the goods shipped to the Philippines were materially false when made.

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me. It does not include all of the facts known to me concerning criminal activity in which I and others engaged. I make this statement knowingly and voluntarily and because I am in fact guilty of the crimes charged.

DATE: 3/9/07

_____
DANIEL CURRAN
Defendant

_____
STEPHEN J. GOLEMBE, ESQ.
Attorney for Defendant