## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Criminal No. 07-0057 (RWR)** |
| | : | |
| **DANIEL CURRAN,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S MOTION FOR SECTION 5K1.1 DOWNWARD DEPARTURE AND MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorneys, the United States Attorney for the District of Columbia and the Fraud Section of the Criminal Division, United States Department of Justice, hereby submits this motion for downward departure pursuant to Section 5K1.1 of the United States Sentencing Guidelines ("USSG") and memorandum in aid of sentencing. The parties agree that the Pre-Sentence Report ("PSR") correctly calculated defendant Curran's offense level under the USSG at a total offense level 28 (78-97 months). *See* PSR at p. 9, ¶ 33. For the reasons described below, the United States submits that, pursuant to Section 5K1.1 of the USSG, the defendant's substantial assistance to law enforcement in this investigation merits a downward departure. The government recommends a six-level downward departure, resulting in a total offense level of 22 (41-51 months). Based on a total offense level of 22, the government recommends concurrent sentences of 41 months' incarceration on each of the two counts, concurrent three year periods of supervised release on each of the two counts, and restitution in the amount of $23,156,828.16.

## FACTUAL BACKGROUND

The parties agree that, between October 2000 and June 2005, defendant Curran was the owner and president of Dankim Trading Company ("Dankim Trading"), an exporting company that was in the business of purchasing United States goods on behalf of clients in the Philippines and shipping those goods overseas. During that same period, the defendant entered into a conspiracy that resulted in him acting as a purported "exporter" in approximately $30 million worth of fraudulent loan transactions, falsifying documents sent to United States lending banks and to the Export-Import Bank of the United States ("Ex-Im Bank"), and misappropriating approximately $24 million in loan proceeds. *See* PSR at p. 5, ¶¶ 7-9. As a result of the conspiracy, the defendant personally realized approximately $400,000 in illicit profits. *Id.* ¶ 15.[1]

During the course of the conspiracy, the defendant prepared false commercial invoices, packing lists, bills of lading, and Ex-Im Bank Supplier's Certificates (collectively "shipping documents") documenting the amount and value of United States goods he claimed to have shipped to the Philippines. Those false documents were sent to the lending banks and the Ex-Im Bank. The Ex-Im Bank is an independent agency of the executive branch of the United States and is also the official export credit agency of the United States. The Ex-Im Bank issues loan guarantees to United States banks on behalf of creditworthy foreign companies for the purpose of purchasing United States goods. Once the Ex-Im Bank issues a loan guarantee, if the foreign borrower defaults on its loan repayments to a United States bank, the Ex-Im Bank pays the amount of the outstanding loan to the United States bank.

---

[1]    The defendant contends that his direct monetary gain "was approximately $360,000, over a three year period." *See* Defendant's Sentencing Memorandum, at p. 5, ¶ 11.E (filed Apr. 15, 2008).

After preparing the false shipping documents, the defendant prepared a second set of shipping documents describing the true value of the United States goods he had actually purchased and shipped to the Philippines. The actual value of United States goods the defendant purchased and shipped to the Philippines was significantly below the amount claimed in the false documents sent to the lending banks and the Ex-Im Bank. Once the lending banks made the loan payments to the defendant, which were intended to reimburse him for the United States goods he had already purchased and shipped, the defendant kept a portion of the loan proceeds and sent the vast majority of the proceeds to foreign bank accounts, as identified and directed by Marilyn Ong, a loan broker based in Manila, Philippines.[2]

Between October 2000 and June 2005, Ms. Ong brokered the $30 million in loans for which the defendant acted as exporter. As a loan broker, Ms. Ong identified purported borrowers in the Philippines and lending banks in the United States and then assisted borrowers in executing loan agreements with the banks and the Ex-Im Bank. Once the loans were finalized, Ms. Ong instructed the defendant to prepare false loan documents, submit the false loan documents to the lending banks and to the Ex-Im Bank, and then misappropriate the loan proceeds.

Relying on information provided by Ms. Ong and the defendant, the Ex-Im Bank provided lending banks with $24 million worth of loan guarantees, promising that the Ex-Im Bank would

---

[2]     A grand jury in the District of Columbia returned a nineteen count indictment against Ms. Ong and co-conspirator Ildefonso Ong, Jr. on October 4, 2007, charging them with one count of conspiracy to defraud the United States and to commit offenses against the United States, in violation of 18 U.S.C. § 371, four counts of false statements, in violation of 18 U.S.C. § 1001, four counts of mail fraud, in violation of 18 U.S.C. § 1341, eight counts of money laundering, in violation of 18 U.S.C. § 1957, and one count of obstructing a proceeding before a department and agency of the United States, in violation of 18 U.S.C. § 1505. *See United States v. Marilyn G. Ong and Ildefonso Ong, Jr.*, Cr. 07-0260 (RWR). Both Ongs remain at large as fugitives.

reimburse the lending banks for any losses incurred in the fraudulent loan transactions. As a result of defaults affiliated with the fraudulent Ong and Curran loan transactions, the Ex-Im Bank has paid $23,156,828.16 in claims to the lending banks. *See* PSR at p. 7, ¶ 19.

When confronted by law enforcement agents about his role in this scheme, the defendant accepted responsibility for his actions and entered a pre-indictment plea to conspiracy to defraud the United States and mail fraud. During the plea colloquy on June 8, 2007, the defendant admitted that between October 2000 and June 2005, he knowingly conspired with Ms. Ong to defraud the Ex-Im Bank and used a commercial interstate carrier in furtherance of that fraud.

## ARGUMENT

The government moves for a downward departure under USSG § 5K1.1. Defendant Curran provided substantial assistance to the government during its investigation and prosecution of coconspirator Marilyn Ong and of freight forwarder Jaime Galvez in several ways.

By agreeing to cooperate at an early stage of the investigation and providing critical information to investigators about the "inner workings" of the scheme to defraud the Ex-Im Bank, Curran assisted the government in investigating and prosecuting Marilyn Ong and others. Curran's cooperation was integral to the prosecution of Ms. Ong, who is living outside of the United States. In international investigations, it is often time consuming and difficult to build a case against defendants living overseas, due to difficulties in obtaining documents and testimony from individuals and entities outside of the country. Mr. Curran has met with law enforcement agents on several occasions and provided them with information about his role in the fraud. Curran's willingness to confess to the crime when confronted by law enforcement, explain conversations he had with Ms. Ong in furtherance of the fraud, and explain his understanding about the Philippine side of the fraud

-4-

allowed the government to investigate and charge Ms. Ong timely and efficiently. Mr. Curran also continued to assist the government in its efforts to prosecute Ms. Ong and others by contacting friends and relatives in an attempt to assist the government in locating Ms. Ong and Ildefonso Ong.

In addition, Mr. Curran explained the process he used to obtain bills of lading from a freight forwarder, Mr. Galvez, and assisted the government in obtaining information necessary to charge Galvez with obstruction of justice and perjury. During the course of the government's investigation, a subpoena for records was issued to Galvez's company, JG International Freight Corporation, which Curran had used as freight forwarder for the fraudulent loan transactions. As a result of Curran's cooperation, law enforcement obtained additional information indicating that after receiving the subpoena, Galvez caused the destruction of numerous documents responsive to the subpoena and testified falsely about his knowledge of the dual invoicing scheme. Galvez was subsequently charged in a two-count Information with perjury, in violation of 18 U.S.C. § 1621, and destroying or concealing records in a federal investigation, in violation of 18 U.S.C. § 1519. *See United States v. Jaime Galvez*, Cr. 07-224 (RWR). Galvez pleaded guilty to those charges on October 5, 2007, and was sentenced on December 20, 2007, to 12 months' and one day in prison.

Based on this substantial assistance, the government recommends a six-level downward departure, resulting in total adjusted offense level of 22 (41-51 months).

## SENTENCING FACTORS

Title 18, United States Code, Section 3553(a), provides numerous factors that the Court shall consider in sentencing Mr. Curran. These factors are discussed below as they are in Section 3553(a).

**(1)  The nature and circumstances of the offense and the history and characteristics of the defendant**

**(A)  Nature and circumstances of the offense**

Here, a Guidelines sentence at an offense level 28 (pre-departure) is reasonable in light of the persistent, pervasive and hugely profitable nature and circumstances of the offense. Mr. Curran's involvement in the scheme spanned a period of more than four years. During those years, the entire purpose of his company, Dankim Trading, appears to have been designed to defraud the United States lending banks, the Ex-Im Bank and, by extension, American taxpayers. Mr. Curran orchestrated twenty-seven separate phony transactions, totaling approximately $30,000,000, through U.S. lending banks and the Ex-Im Bank. *See* PSR at p. 5, ¶ 11 and p. 7, ¶ 19. Those transactions resulted in Curran's company receiving approximately $24,000,000 in fraudulent loan proceeds. *Id.* at p. 6, ¶ 15. Of that amount, Curran kept approximately $400,000 for himself and transferred the rest to bank accounts as directed by Ms. Ong. *Id.* As a result of his fraudulent conduct, the Ex-Im Bank has suffered a loss of $23,156,828.16. The only persons to benefit from the fraud were Curran and his co-conspirators.

This case illustrates how a government program intended to benefit United States businesses, by increasing United States exports to companies overseas, can be exploited by a United States citizen looking to make easy, and undeserved, money. In administering its insurance and guarantee programs, the Ex-Im Bank relied on United States-based exporters to provide truthful information

about the legitimacy of the transactions in which they engage.  Because the Ex-Im Bank provided insurance products and guarantees to borrowers in foreign countries, and often borrowers in developing nations, it relied on United States exporters – such as Mr. Curran – to certify that loan proceeds would be used to reimburse the exporters for United States goods that were actually purchased and shipped to the borrowers.  Without this certification, which is contained in the Ex-Im Bank Supplier's Certificate, the Ex-Im Bank transactions could not have been completed.

Curran abused this trust by intentionally making false statements on Ex-Im Bank Supplier's Certificates and on related documents that he prepared for the sole purpose of misappropriating the loan proceeds.  Instead of purchasing approximately $30 million worth of United States goods and shipping them to borrowers in the Philippines, as he had represented that he had and would, Curran pocketed approximately $400,000 and transferred approximately $23 million to bank accounts as directed by Ms. Ong.  Curran's fellow citizens - the American taxpayers - have been left to pick up the enormous tab that resulted from his fraudulent conduct.

At the same time, it was Marilyn Ong – not Daniel Curran – who masterminded the scheme.  She identified borrowers in the Philippines, matched the borrowers up with lenders in the United States, and facilitated the Ex-Im Bank guarantees.  She also recruited the defendant into the scheme and explained to him how he should make it appear he was shipping goods that he was not actually shipping.  She, rather than Mr. Curran, also kept the vast majority of the fraudulent loan proceeds once the phony transactions were completed.

### (B)    The history and characteristics of the defendant

The defendant was born in Yonkers, New York and raised in a middle-class family with his one sister and two brothers.  He later married Mary Katherine Curran (formerly Seeto

Ong), who is the niece of a co-conspirator in this case, and raised two children who are now adults. Curran described his family relationships as "very close."

Curran is a high school graduate and attended one year of college.  He served in the United States Air Force as a freight traffic specialist for approximately four years, then continued to serve in the reserves for an additional two years.  Curran later worked for 11 years as a Quality Assurance Manager for a New York plastics company, making as much as $76,000 a year.  It was during the last years of his employment at this plastics company that Curran opened Dankim Trading and began engaging in the fraudulent Ex-Im Bank scheme.  It appears that from 2002 through 2005, the defendant's livelihood was funded primarily - if not exclusively - from the proceeds of his fraud.

Other than a traffic violation, *see* PSR at p. 10, ¶ 37, Mr. Curran has no prior criminal record. After committing the instant offenses, the defendant accepted full responsibility for his conduct and has provided substantial assistance to the government in its investigation and prosecution of others.

**(2)    The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the office; (B) to afford adequate deterrence; (C) to protect the public from further crimes of the defendant; and (D) to provide defendant with appropriate education or vocational training.**

Here, a Guidelines sentence at an offense level 28 (pre-departure) is also reasonable in light of the need for the sentence imposed to reflect the seriousness of the offense, provide just punishment for the offense and to afford adequate deterrence.  Mr. Curran stole approximately $24 million from U.S. lending banks and the Ex-Im Bank.  His participation in the scheme was wholly voluntary, entirely avoidable and obviously criminal.  Although Mr. Curran does not appear to have orchestrated this crime, he was a willing and essential figure in its execution.  Without him as the U.S. based "exporter," the crime could not have succeeded.  He chose to engage in the fraudulent

scheme for over four years, and as part of twenty-seven separate, fraudulent loan transactions, for the apparent purpose of enjoying the fruits of the crime.  There should be serious personal consequences to Mr. Curran for engaging in such wanton illegality.

In addition to punishing Mr. Curran for his involvement in the scheme, the sentence should reflect the need to deter others from engaging in similar schemes.  As the world's commercial activity becomes increasingly inter-connected and sophisticated fraud schemes targeting the United States extend beyond the borders of the United States, it is important for the Court to impose sentences on the United States-based conspirators, without whom the fraud could not occur, that adequately deter future crimes.  As the Court is also aware, this is one of several related cases that involved schemes to defraud the Ex-Im Bank.  It appears that the type of scheme the defendant engaged in is becoming all too common.  As with all newly budding crimes, it is important for the Court to demonstrate through the sentencing process that these new crimes will not be tolerated and that the perpetrators of such crimes will be severely punished for their actions.

The government recognizes, however, that the significance of Mr. Curran's crime and the need to deter future crime should be counterbalanced with the defendant's predominately good conduct as a productive member of society, timely acceptance of responsibility when confronted by law enforcement agents, and transfer of the vast majority of the criminal proceeds to others.  Although the government does not believe the size of Curran's personal profit mitigates his responsibility for the full $24 million crime, it does believe that this is a factor that may be considered, along with Curran's prior conduct and timely acceptance of responsibility, in fashioning an appropriate sentence within the Guidelines.

As to the final consideration, the defendant does not appear to need further education or vocational training.

### (3)    The kinds of sentences available

The maximum statutory terms of imprisonment at issue here reflect the serious nature of the crimes committed by the defendnat.  Conspiracy to defraud the United States carries a maximum statutory term of 5 years imprisonment, is a Class C felony, and provides for a term of supervised release of not more than 3 years.  *See* 18 U.S.C. § 371.  Mail fraud carries a maximum statutory term of 30 years imprisonmen, is a Class B felony, and provides for a term of supervised release of not more than five years.  *See* 18 U.S.C. §§ 1341, 3559.

### (4)    The sentencing range established by the USSG

The government and the defendant stipulated in the plea agreement to an adjusted offense level of 28.  With a Criminal History category I, which the PSR has recommended, the resulting advisory sentencing range under the USSG is 78-97 months.  As stated above, the government recommends a six-level downward departure under USSG § 5K1.1 based on the defendant's substantial assistance, for an adjusted total offense level of 22.  The resulting USSG range recommend by the government is, therefore, 41-51 months.

In the plea agreement, the parties stipulated that the applicable fine range for both counts one and two was $1,250,000 or twice the pecuniary gain or loss.  The Probation Office concurs with this fine range.  Based on Mr. Curran's financial condition, the government is not recommending a fine.

### (5)    Any pertinent policy statement issued by the USSC

The government is unaware of any pertinent policy statements issued by the USSC.

**(6)    The need to avoid unwarranted sentencing disparities among defendants with similar records**

A Guidelines sentence at an offense level 28 (pre-departure) would also be reasonable in light of the need to prevent disparities between the defendant and defendants with similar records as well as between him and defendants in similar cases.  A defendant in a separate scheme to defraud the Ex-Im Bank, Robert Delgado, was sentenced to 24 months incarceration by this Court on October 5, 2007.  *See United States v. Robert Delgado*, Cr. 06-0313 (RWR).  Delgado, who had not provided substantial assistance to the government at the time of his sentencing, was part of a $2.1 million scheme to defraud the Ex-Im Bank and personally received $100,000 of the scheme's proceeds.

Additionally, a defendant in yet another separate scheme to defraud the Ex-Im Bank, David Villongco, was sentenced to 33 months incarceration by this Court on February 29, 2008.  *See United States v. David Villongco*, Cr. 07-00009 (RWR).  Like Curran, Villongco had provided substantial assistance to the government at the time of his sentencing  and the Court granted the government's motion for a downward departure pursuant to USSG Section 5K1.1.  Villongco engaged in a $20 million scheme to defraud the Ex-Im Bank and personally received approximately $150,000 of the scheme's proceeds.

**(7)    The need to provide restitution**

Based on his financial conditioin, the defendant agreed to forfeit to the United States at the time of sentencing $150,000 of the $400,000 in proceeds he received from the fraud.  The government requests that the Court hold Curran responsible, jointly and severally, for the entire restitution amount attributable to scheme, which amounts to $23,156,828.16.

## CONCLUSION

For the foregoing reasons, the government respectfully moves for a downward departure under U.S.S.G. § 5K1.1, with a recommended downward departure of six levels, resulting in an adjusted total offense level of 22 (41-51 months).   The government recommends concurrent sentences of 41 months' incarceration on each of the two counts, concurrent three-year periods of supervised release on each count, and restitution in the amount of $23,156,828.16.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
In and For the District of Columbia

By:    _____/s/_____
MICHAEL K. ATKINSON
D.C. Bar # 430517
Assistant United States Attorney
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C.  20530
(202) 616-3702
Michael.Atkinson2@usdoj.gov

STEVEN A. TYRRELL
Chief, Fraud Section
Criminal Division
United States Department of Justice

By:    _____/s/_____
HANK BOND WALTHER
D.C. Bar # 477218
Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice
1400 New York Avenue, NW
Washington, D.C. 20005
(202) 257-6176

Dated: April 16, 2008                    Hank.Walther@usdoj.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **v.** | **:** | **Criminal No. 07-0057 (RWR)** |
| | **:** | |
| **DANIEL CURRAN,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## <u>ORDER</u>

Upon motion of the United States of America for a downward departure under Section 5K1.1 of the United States Sentencing Guidelines based on substantial assistance provided by the defendant in the investigation and prosecution of other persons, arguments of counsel, and the entire record in this matter, it is hereby

ORDERED that the government's motion for a downward departure under Section 5K1.1 of the United States Sentencing Guidelines is GRANTED.

Entered in Washington, D.C., this _____ day of_____, 2008.


_____
RICHARD W. ROBERTS
United States District Judge

cc:    Michael K. Atkinson
        Assistant United States Attorney
        United States Attorney's Office
        555 Fourth Street, N.W., Room 5830
        Washington, D.C.  20530
        Michael.Atkinson2@usdoj.gov

        Hank Bond Walther
        Trial Attorney
        U.S. Department of Justice
        Criminal Division, Fraud Section
        1400 New York Avenue, N.W., 3rd Floor
        Washington, D.C.  20005
        Hank.Walther@usdoj.gov

        Stephen J. Golembe, Esquire
        Stephen J. Golembe & Associates, P.A.
        2340 South Dixie Highway
        Miami, FL 33133
        Golombes@golembelaw.com